602 S.E.2d 760

**Nellie DURHAM, Respondent–Appellant,**

v.

**David VINSON, Jr., M.D. and Upstate General Surgery, P.A., Appellants–Respondents.**

No. 25872.

Supreme Court of South Carolina.

Heard Sept. 24, 2003.

Decided Sept. 13, 2004.

Rehearing Denied Oct. 6, 2004.

640

Alexander M. Sanders, Jr., of Charleston; O. Doyle Martin, Jack H. Tedards, Jr., Russell D. Ghent, and Seann A. Gray, all of Leatherwood Walker Todd & Mann, P.C., of Greenville, for Appellants–Respondents.

Chad Alan McGowan, of McGowan & Hood, of Rock Hill; F. Patrick Hubbard, of Columbia; and Joseph G. Wright, III, of Wright Law Offices, of Anderson, for Respondent–Appellant.

Chief Justice TOAL:

We are asked to rule on several issues regarding alleged errors made during a medical malpractice trial. We affirm in part and reverse in part.

## FACTUAL/PROCEDURAL BACKGROUND

Respondent–Appellant, Nellie Durham (Durham), was referred to Appellant–Respondent, Dr. David Vinson (Dr. Vinson), for a surgical evaluation after being diagnosed with acid reflux and a hiatal hernia. On October 26, 1996, Dr. Vinson attempted to repair the hernia by performing a laparoscopic Nissen fundoplication (LNF)—an advanced form of laparoscopic surgery. During the LNF, Dr. Vinson did not "take down" the short gastric vessels, which would have prevented the repair from being too tight.

Initially, Durham appeared to respond well to the surgery, but then she began to have trouble swallowing and began to vomit. An esophagram, performed on October 28, revealed that food particles were dispersed throughout the esophagus and that the esophagus was not completely clearing the barium used in the esophagram. As a result, Dr. Vinson performed an esophageal gastroduodenoscopy (EGD) on Durham the next day. During the EGD, Durham's gag reflex was suppressed. Whether Durham aspirated[1] during this procedure or during the repair surgery conducted the next day became an issue at trial. It was clear, however, that Durham aspirated while under the care of Dr. Vinson, and that, most likely, this aspiration occurred during the EGD.

---

1. An aspiration refers to the accidental sucking in of food particles or fluids into the lungs.

On October 30, Dr. Vinson performed a repair LNF on Durham. During this surgery, Dr. Vinson took down the short gastric vessels. Dr. Vinson also instructed Diane Hardy, a Certified Registered Nurse Anesthetist, to advance a dilator down Durham's esophagus during the surgery, even though Hardy protested three times that it was too tight. Hardy followed Dr. Vinson's orders and, as a result, Durham's esophagus was perforated. When the perforation occurred, Dr. Vinson switched from performing the procedure laparoscopically to performing an open procedure in order to repair the perforation.

After the repair LNF surgery, Durham could not breathe without mechanical assistance and was transferred to the Critical Care Unit (CCU) at Oconee Hospital. Durham's family did not learn Durham had aspirated and her esophagus had been perforated until Durham was later moved to Greenville Memorial Hospital. Dr. Vinson informed the family that everything had gone well and that she was only in CCU as a precaution.

While Durham was in CCU, her family requested that Dr. Vinson consult a pulmonologist. However, he did not do so. Durham's family also requested that she be moved to Greenville Memorial Hospital, a better-equipped facility, but Dr. Vinson advised against the transfer because he believed that she could be properly cared for at Oconee Hospital. Finally, after two days, the family obtained the transfer order from a nurse. Durham entered Greenville Memorial Hospital and remained there for over two months, with her first month being spent in the CCU.

As a result of Dr. Vinson's treatment, Durham developed adult respiratory distress syndrome and later, due to the complications stemming from her aspiration, developed pulmonary fibrosis. At present, Durham can only walk for very short distances and requires supplemental oxygen twenty-four hours a day.

■ Durham brought a medical malpractice action against Dr. Vinson. After the liability phase of the bifurcated trial,[2]

_____
**2.** Trial judges have discretion as to whether to bifurcate a trial. Rule 42(b), SCRCP; *Senter v. Piggly Wiggly Carolina Co.,* 341 S.C. 74, 77,

the jury found Dr. Vinson was liable to Durham for $2,250,000 in actual damages, and the jury found his conduct to be willful, wanton, or in reckless disregard of Durham's rights. The trial then proceeded to the punitive damages phase. The jury awarded Durham $15,000,000 in punitive damages.

Following post-trial motions, the trial court found the award did not violate Dr. Vinson's due process rights, but remitted the award to $8,000,000 on the basis the award was merely liberal.

Dr. Vinson appeals the trial court decision, raising the following issues:

I. Did the trial court err by allowing testimony during the liability phase regarding Dr. Vinson's hospital privileging file?

II. Did the trial court err by giving the jury a charge during the liability phase that contained an incorrect discussion of the standard of care in a medical malpractice action?

III. Did the trial court err by allowing, in the punitive damages phase, the admission of evidence that Dr. Vinson prescribed valium to Durham's daughter?

## LAW/ANALYSIS

### I. HOSPITAL PRIVILEGING FILE

Dr. Vinson argues Durham's counsel should not have been allowed to question him about his failure to produce only a portion of his hospital privileging file and then further prejudice him by mentioning this failure in closing argument. We agree but find the error harmless.

---

533 S.E.2d 575, 577 (2000). Although some states require bifurcation in every case in which the plaintiff seeks punitive damages, we are unwilling to impose such a requirement. We encourage judges, however, to bifurcate trials in complex medical malpractice cases such as this one, particularly when bifurcation helps to clarify and simplify the issues. Nonetheless, in exercising their discretion, trial judges must continue to heed the "separate issue" mandate of Rule 42(b); *see also Flagstar Corp. v. Royal Surplus Lines,* 341 S.C. 68, 73, 533 S.E.2d 331, 333 (2000) (trial judges are responsible for determining whether trial issues are distinct enough to warrant severability).

The hospital privileging file contains information related to a doctor's attempt to acquire certain privileges at the hospital, such as the privilege to perform an LNF.

S.C.Code Ann. § 40–71–20 (2001) provides, in part, as follows:

All proceedings of and all data and information acquired by the committee referred to in Section 40–71–10 [3] in the exercise of its duties are confidential ... These proceedings and documents are not subject to discovery, subpoena, or introduction into evidence in any civil action ... Information, documents, or records which are otherwise available from original sources are not immune from discovery or use in a civil action merely because they were presented during the committee proceedings nor shall any complainant or witness before the committee be prevented from testifying in a civil action as to matters of which he has knowledge apart from the committee proceedings....

■■ The overriding public policy of the confidentiality statute is to encourage health care professionals to monitor the competency and professional conduct of their peers to safeguard and improve the quality of patient care. *McGee v. Bruce Hosp. Sys.*, 312 S.C. 58, 61, 439 S.E.2d 257, 259 (1993). The underlying purpose behind the confidentiality statute is not to facilitate the prosecution of civil actions, but to promote complete candor and open discussion among participants in the peer review process. *Id.* In *McGee,* we further noted:

The policy of encouraging full candor in peer review proceedings is advanced only if all documents considered by the committee ... during the peer review or credentialing process are protected. Committee members and those providing information to the committee must be able to operate without fear of reprisal. Similarly, it is essential that doctors seeking hospital privileges disclose all pertinent information to the committee. Physicians who fear that information provided in an application might someday be used against them by a third party will be reluctant to fully detail matters that the committee should consider.

---

**3.** S.C.Code Ann. § 40–71–10 (2001) (members of certain professional committees exempt from tort liability).

*Id.* at 61–62, 439 S.E.2d at 259–260 (quoting *Cruger v. Love,* 599 So.2d 111 (Fla.1992)).

We concluded, however, that the outcome of the decision-making process is not protected from discovery. Therefore, a plaintiff is entitled to know the clinical privileges either granted or denied by the hospital. *Id.* at 63, 439 S.E.2d at 260–261.

During Durham's direct examination of Dr. Vinson, Dr. Vinson was asked about Durham's medical records and the fact that they are confidential. He was also asked about the fact that Durham complied with his request that she disclose her medical records. Dr. Vinson was then asked: "Correspondingly we requested that you provide us with the application and supporting documents." Dr. Vinson's counsel objected and a discussion ensued outside the hearing of the jury.

Dr. Vinson argued that the privileging file was confidential under *McGee* and section 40–71–20 and that Durham was trying to create the impression that he had something to hide.

The trial court found Dr. Vinson could be asked about the privileging file but that the questions should be limited to whether Dr. Vinson authorized his attorneys to disclose the results of the privileging file.[4]

The testimony then continued with Durham's counsel asking Dr. Vinson whether he was aware that his privileging file was confidential and could not be disclosed without his consent.

---

4. Durham argues and the trial court found that Dr. Vinson opened the door to asking questions about the privileging file during his opening argument. In opening, counsel stated:

Dr. Vinson was a fully licensed physician, authorized by South Carolina law to practice medicine and to practice surgery. Board certification was not required for Dr. Vinson to get his privileges to practice surgery including doing the [LNF]. Dr. Vinson presented his information to the credentials accrediting authorities at Oconee Memorial Hospital and was given the authority to do the procedures he did on Ms. Durham. He was not required to be Board certified. This did not, however, open the door to the evidence. Because Durham's counsel emphasized in opening argument that Dr. Vinson was not board certified in surgery, Dr. Vinson simply desired to point out in his opening that, although he was not board certified, he was in fact privileged by Oconee Hospital to perform surgery. Further, the information Dr. Vinson relayed to the jury only concerned the results of the privileging process.

648

Dr. Vinson responded yes to the questions. Then, the following exchange occurred:

Q: And we on behalf of Mrs. Durham requested that you fully disclose the results of your [privileging] file . . . however you only allowed the disclosure of part of that file, is that correct?

Mr. Gray: Your Honor—

The Court: Yes sir.

Mr. Gray: Again I think that's not a correct statement.

The Court: . . . I'm going to overrule your objection . . .

. . .

Q: On behalf of . . . Durham we requested your entire— that you fully disclose the results of your . . . [privileging] file but you only authorized a portion of that file to be produced, is that correct?

A: Correct.

On cross-examination by his counsel, Dr. Vinson stated there were no results of the privileging process that were adverse to him.

During closing argument, Durham's counsel stated:

Let me mention about privileges. It is true that Dr. Vinson was privileged by Oconee Memorial Hospital to perform this surgery. It is also true that Dr. Vinson was privileged to perform surgical critical care. Dr. Vinson submitted certain information to Oconee Memorial Hospital. One of the things he submitted was a resume or what is referred to as a Curriculum Vitae. This was submitted. He had a fellowship, surgical critical care. Is there anywhere on that sheet that says that critical care fellowship was unaccredited? No. Had it been, would that have made a difference? I don't know. *We haven't seen the file but I think that's an important deception.* The second thing I'd like to point out is I don't know what Dr. Vinson told them about his training in residency. If he told them what was in the sworn statement to you ladies and gentlemen of the jury, he did not have proctoring and under the regulations he would have to have it or did he tell what he told his expert when he put him on the stand—I've been trained. I

*don't know. If he told them something that wasn't true they would have given privileges.*

(emphases added). Durham's counsel also stated, "He has tried to deceive everyone throughout this litigation and now he's trying to commit the ultimate sin and that's to deceive you ladies and gentlemen of the jury."

 The trial court erred by allowing Durham's counsel to ask Dr. Vinson about his failure to fully disclose his privileging file, a file that he was under no obligation to disclose pursuant to section 40–71–20. If physicians can be questioned before the jury about the refusal to produce this privileged information, the effect is to pressure them toward disclosure of the privileging file. As occurred here, the exercise of the statutory right not to disclose the information would be used against the physician as evidence the physician is hiding something. Allowing this to occur does not serve the policy goals of promoting candor and open discussion among participants in the peer review process. *See McGee,* 312 S.C. at 62, 439 S.E.2d at 259 (participants in the peer review process must be able to operate without fear of reprisal).

This error was exacerbated when counsel effectively argued that Dr. Vinson had deceived everyone by failing to disclose the file. The fact that Dr. Vinson was able to tell the jury that he had no adverse results during the privileging process did not cure the error. The jury was not informed that Dr. Vinson was not obligated to produce his privileging file by statute. Instead, the jury was allowed to believe Dr. Vinson was not forthcoming for some unstated reason and, as a result, the jury may have believed Dr. Vinson was attempting to conceal something in the file.

 However, we find the error harmless. First, there was other properly admitted evidence that indicated Dr. Vinson was being deceitful, such as (1) failing to indicate his fellowship program was unaccredited on his curriculum vitae, (2) telling Durham's family that Durham was fine and had only been placed in the CCU as a precaution, (3) failing to call a specialist upon the family's request, (4) misinforming his own expert about the training he had in performing a LNF, and (5) attempting to shift the blame for Durham's aspiration on another doctor.

Second, the evidence of Dr. Vinson's liability is overwhelming. The breach of his duty of care to Durham is uncontradicted, especially in light of the fact that his own expert believed Dr. Vinson's treatment of Durham had deviated from the standard of care.

## II. JURY CHARGE ON STANDARD OF CARE

As to the standard of care, the court charged the jury as follows:

A physician or surgeon who undertakes to render professional services must meet these requirements. The physician must *possess the degree of professional learning*, skill and ability which others similarly situat[ed] ordinarily possess at the time. The physician must exercise reasonable care and diligence in the application of this knowledge and skill to the patient's care and the physician must use his best judgment in the treatment and care of his patient. . . . If the physician fails in any of those particulars and such failure is the proximate cause of injury and damage the physician is liable.

(emphasis added). The court again charged that a physician "shall possess and exercise that degree of knowledge, care and skill ordinarily possessed by members of his profession in good standing under the same or similar circumstances."

Dr. Vinson argues the knowledge component should not have been included in the charge. He contends that Durham's repeated emphasis on his education and training, combined with the trial judge's charge, created the impression the jury could find Dr. Vinson liable for malpractice solely on the basis of a lack of education or background, that is, if they found he did not "possess the degree of professional learning" that he should have, regardless of his conduct in treating Durham. We disagree.

To the extent that the trial court's charge suggests that a lack of professional learning, by itself, constitutes a breach of the standard of care, the charge was erroneous. The standard of care in a medical malpractice action concerns *both* the physician's skill and the physician's professional learning. Accordingly, the appropriate standard of care charge is the following: A physician is only bound to possess

and exercise that degree of skill *and* learning that is ordinarily possessed and exercised by members of his profession in good standing acting in the same or similar circumstances. *King v. Williams*, 276 S.C. 478, 482, 279 S.E.2d 618, 620 (1981) (degree of care which must be observed is that of an average, competent practitioner acting in same or similar circumstances); *Bessinger v. DeLoach*, 230 S.C. 1, 7, 94 S.E.2d 3, 6 (1956) (physician has been held to degree of skill and learning which is ordinarily possessed and exercised by members of his profession in good standing in the same general neighborhood or in similar localities).[5]

▇▇▇ Professional learning is pertinent to a physician's background and training, particularly when the procedure in question—such as the one performed in the present case—requires a special kind of learning. Therefore, the knowledge component was properly included in the jury charge. But the lack of or inadequacy of such knowledge is not, by itself, dispositive as to whether a physician is liable for medical malpractice. Therefore, the portion of the charge instructing the jury to find the physician liable if he "fails in *any* of those particulars and such failure is the proximate cause of injury and damage," was erroneous. We note that this is a minor judicial error in an otherwise appropriate charge.

▇▇▇ Nonetheless, we find the error harmless given that Dr. Vinson's liability to Durham is so clear. As noted previously, it is uncontradicted that Dr. Vinson committed a gross breach of the standard of care in more than one instance while treating Durham.

### III. Valium Prescription Evidence

▇▇▇ Dr. Vinson argues he is entitled to a new trial due to the admission of evidence, during the punitive damages phase of the bifurcated trial, that he prescribed valium to Durham's daughter and that he instructed her to give the valium to other family members. We agree.

---

5. This Court eventually eliminated the phrase, known as the locality rule, "in the same general neighborhood or in similar localities" and replaced it with the phrase, "acting in same or similar circumstances." *King*, 276 S.C. at 482, 279 S.E.2d at 620.

Durham's daughter testified Dr. Vinson told her that she and her sisters were upsetting Durham while she was in the CCU. She stated that he wrote her a prescription for sixty valiums, and told her to take them and pass them around to the other sisters to calm them down. The daughter stated that she was never a patient of Dr. Vinson's. Another daughter corroborated this testimony.

In addition, a portion of the deposition of Dr. Vincent Russo, an expert for Durham, was admitted during the punitive damages phase. Dr. Russo testified regarding the valium prescription incident. The court overruled defense counsel's objection on the basis the evidence was relevant to the *Gamble*[6] factor concerning Dr. Vinson's awareness or concealment. The court further stated the evidence did not violate Rule 403, SCRE.[7]

Dr. Russo testified Dr. Vinson attempted to alleviate the family's anxiety about Durham by prescribing valium to Durham's daughter and telling her to distribute the valium to the other relatives. Dr. Russo opined that a reasonable surgeon does not engage in such conduct and that his actions were incompetent and could be criminal and unethical.

We find that the trial court erroneously allowed the valium prescription evidence. The evidence was inappropriate because it concerned Dr. Vinson's misconduct towards a third party, rather than his misconduct towards Durham. We disagree with the trial court's finding that the evidence was relevant to the *Gamble* factor of concealment. The finding

6. *Gamble v. Stevenson*, 305 S.C. 104, 111–112, 406 S.E.2d 350, 354 (1991), set out the factors to be used when conducting a review of a punitive damage award. The factors are: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) other factors deemed appropriate.

7. Rule 403, SCRE, states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

that the evidence is relevant to whether Dr. Vinson attempted to conceal his misconduct towards Durham is attenuated. Further, the evidence is inflammatory, especially in light of the fact that the valium prescription evidence was the only evidence admitted during the punitive damages phase. We find the evidence violates Rule 403, SCRE, because the prejudicial effect of the evidence outweighs any probative value it may have had. By allowing the evidence, the trial court allowed the jury to punish Dr. Vinson for a bad act unrelated to his actions towards Durham. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 409, 123 S.Ct. 1513, 1515, 155 L.Ed.2d 585 (2003) (defendant's dissimilar acts, independent from acts upon which liability was premised, may not serve as basis for punitive damages; defendant should be punished for conduct that harmed plaintiff, not for being an unsavory individual).

Accordingly, we reverse the trial court on this ground and remand the case for a new punitive damages phase.

## CONCLUSION

We find the trial court committed two errors during the liability phase of trial. The trial court erred by allowing Durham's counsel to ask Dr. Vinson about his failure to fully disclose his privileging file and by giving an inappropriate standard of care charge to the jury. But we find the errors harmless given that Dr. Vinson's liability to Durham is so clear based on the uncontradicted evidence that Dr. Vinson committed a gross breach of the standard of care in more than one instance while treating Durham.

We further find the admission of the valium prescription evidence during the punitive damages phase violates Rule 403, SCRE. Because this error was not harmless, we reverse the trial court and remand the case for a new punitive damages phase.

The following issues raised by Appellants–Respondents are not preserved for review: Issues I, V, VII, XI, and XIII. *See Bakala v. Bakala,* 352 S.C. 612, 576 S.E.2d 156 (2003) (due process claim raised for first time on appeal is not preserved); *Mizell v. Glover,* 351 S.C. 392, 570 S.E.2d 176 (2002) (to preserve issue for appellate review, issue must have been

raised to and ruled upon by trial court); *Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35 (1996) (party may not argue one ground for objection at trial and another ground on appeal); *Varnadore v. Nationwide Mut. Ins. Co.,* 289 S.C. 155, 345 S.E.2d 711 (1986) (proper course is to object immediately to improper argument).

Appellants–Respondents' remaining issues are without merit and we affirm pursuant to Rule 220(b), SCACR, and the following authorities: Issue II: *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991); Issue VI: Rule 803(4) and 803(6), SCRE; Issues VIII and IX: *Elledge v. Richland/Lexington Sch. Dist. Five,* 352 S.C. 179, 573 S.E.2d 789 (2002) (admission of testimony largely within trial court's sound discretion, exercise of which will not be disturbed on appeal absent abuse of discretion). Respondent–Appellant's issue is also without merit and we affirm pursuant to Rule 220(b), SCACR, and the following authority: *Cock–N–Bull Steak House, Inc. v. Generali Ins. Co.,* 321 S.C. 1, 466 S.E.2d 727 (1996) (grant of motion is within trial court's discretion, and absent abuse of discretion, it will not be reversed on appeal).

**AFFIRMED IN PART; REVERSED IN PART.**

WALLER, BURNETT, PLEICONES, JJ., and Acting Justice G. THOMAS COOPER, Jr., concur.