615 S.E.2d 440

Jack WEBB, Personal Representative of the Estate of Susan Webb, Respondent/Appellant,

v.

CSX TRANSPORTATION, INC., South Carolina Department of Transportation, and Anderson County, Defendants,

of which CSX Transportation, Inc. is, Appellant/Respondent.

No. 26004.

Supreme Court of South Carolina.

Heard Dec. 1, 2004.

Decided June 20, 2005.

Rehearing Denied July 21, 2005.

Sarah P. Spruill, Manton M. Grier, and Marvin D. Infinger, all of Haynesworth Sinkler Boyd, P.A., of Columbia, for Appellant/Respondent.

J. Calhoun Pruitt, Jr., of Pruitt & Pruitt, of Anderson, and John E. Parker and Ronnie L. Crosby, both of Peters, Murdaugh, Parker, Eltzroth & Detrick, PA, of Hampton, for Respondent/Appellant.

Justice PLEICONES:

This is a railroad crossing case. Appellant/ respondent (CSX) appeals a jury verdict awarding respondent/appellant (Plaintiff) $3 million actual damages in his wrongful death action; $250,000 actual damages in the survival action; and $875,000 punitive damages. Plaintiff appeals an order finding CSX violated S.C.Code Ann. § 58–17–3420 (1976) but declining to award him damages for this breach. We affirm the order appealed by Plaintiff, but reverse the jury verdicts, and remand those claims for a new trial.

## FACTS

In approximately 1912, a railroad line was constructed in the town of Pelzer. The line runs parallel to the Saluda River and crosses several existing roads. The railroad track effectively separates approximately twenty-one homes (the mill village) from the rest of Pelzer. The area is hilly, and while the railroad created grade crossings at Jordan and Stephens Streets, it made a cut under Green Street and built a wooden bridge to carry road traffic over the railway. The Green Street Bridge was the primary route for persons traveling to and from the mill village.

In July 1998, arsonists damaged the Green Street Bridge rendering it unusable by vehicles. The Jordan Street Cross-

ing became the primary ingress/egress point. Jordan Street is horseshoe-shaped, and the crossing is located in the curve of the horseshoe. The crossing is at the bottom of a hill, so that vehicles approaching it from either direction are traveling downhill. The Jordan Street Crossing is "passive," that is, controlled only by a cross-buck.[1]

The railroad line crossing Jordan Street is used only to deliver coal to a Duke Power steam plant; there are approximately five trains a week, and the speed limit for the trains is twenty-five miles per hour. There was evidence that approximately 465 to 495 vehicles used the Jordan Street Crossing on a weekday, with less vehicular traffic on weekends.

On the evening of June 17, 2000, at approximately 6:00 p.m., Doris Medlin and her sister-in-law, Susan Webb (Plaintiff's decedent), were returning to their homes in the mill village after grocery shopping. As Mrs. Medlin drove her car across the tracks, the car was struck by a CSX train returning from the power plant after dropping off loaded coal cars. The train consisted of two engines hooked together, and was traveling about twenty-five miles per hour.[2] Mrs. Medlin survived the wreck; Mrs. Webb, the front seat passenger, died about two months later from injuries sustained in the accident.

We address Plaintiff's appeal first.

## PLAINTIFF'S APPEAL

Whether the trial judge erred in finding CSX's failure to repair the Green Street Bridge was not the proximate cause of this accident?

## ANALYSIS

Plaintiff contends that S.C.Code Ann. § 58–17–3420 imposes a legal obligation on CSX to repair the Green Street Bridge,

---

1. "A Crossbuck Sign is one of the oldest warning devices. It is a white regulatory, X-shaped sign with the words "Railroad Crossing" in black lettering . . . . [it] is a passive yield sign [and] . . . . is considered the same as a 'Yield Sign.'" http://www.oli.org/ol—basics/engineering/cross-buck.html.

2. There is no contention on appeal that the train was exceeding the permissible speed limit.

and that its failure to do so entitles Plaintiff to damages pursuant to S.C.Code Ann. § 58–17–3980 (1976). The circuit court agreed 3420 required CSX to repair the bridge, but held that damages were awardable under 3980 only if the failure to repair were a proximate cause of Plaintiff's decedent's death. Finding the bridge repair issue a remote rather than efficient cause of the accident, the court declined to award damages. Plaintiff argues this was error. We disagree.

Section 58–17–3420, entitled "Construction and maintenance of bridges," is part of the General Railroad Law, and provides:

Every railroad corporation shall, at its own expense, construct, and afterwards maintain and keep in repair, all bridges, with their approaches or abutments, which it is authorized or required to construct over or under any turnpike road, canal, highway or other way and any city or town may recover of the railroad corporation whose road crosses a highway or town way therein all damages, charges and expenses incurred by such city or town by reason of the neglect or refusal of the corporation to erect or keep in repair all structures required or necessary at such crossing. But if, after the laying out and making of a railroad, the governing body of a county has authorized a turnpike, highway or other way to be laid out across the railroad, all expenses of and incident to constructing and maintaining the turnpike or way at such crossing shall be borne by the turnpike corporation or the county, city, town or other owner of it.

In this case, CSX's alleged violation of 3420 was tried to the judge as an equity matter at the same time the jury was hearing Plaintiff's negligence claims. The theory of CSX's equitable liability to Plaintiff rests on S.C.Code Ann. §§ 58–17–3980 and 58–17–3990 (1976). Section 3980, entitled "Damages and penalty for unlawful acts where no specific penalty provided for," provides:

If any person shall do, suffer or permit to be done any act, matter or thing in this chapter declared to be unlawful, shall omit to do any act, matter or thing in this chapter required to be done or shall be guilty of any violation of any of the provisions of this chapter, such person shall, when no specific penalty is herein provided for such violation, forfeit and

pay to the person who may sustain damage thereby a sum equal to three times the amount of the damages so sustained, to be recovered by the person so damaged by suit in the circuit court of any county in this State in which the person causing such damage can be found or may have an agent, office or place of business. But in any such case of recovery the damage shall not be assessed at a less sum than two hundred and fifty dollars. And the person so offending shall, for each offense, forfeit and pay a penalty of not less than one thousand dollars, to be recovered by the State by action in any such circuit court to be brought by the Attorney General upon the request of the Public Service Commission.

The next statute, § 58–17–3990, provides:

Any action brought as provided in § 58–17–3980 to recover any penalty or damages shall be regarded as a subject of equity jurisdiction and discovery and affirmative relief may be sought and obtained therein. In any such action so brought as a case of equitable cognizance, preliminary or final injunction may, without allegation or proof of damage to the complainant, be granted upon proper application, restraining, forbidding and prohibiting the commission or continuance of any act, matter or thing by this chapter prohibited or forbidden.

Although the failure to repair the Green Street Bridge issue was ostensibly being tried to the judge alone as an equity matter, the jury heard all the evidence, including evidence that CSX at one time promised to repair the bridge, but then decided not to. There was evidence from numerous mill village residents and a local politician about their efforts to have CSX replace the bridge, as well as testimony about the deleterious effects on the community resulting from CSX's refusal to repair.

■ After the jury returned its verdicts, the judge asked it to return an advisory interrogatory answering whether it found that CSX's failure to repair the bridge was "the proximate cause of damages in this case." The jury returned in six minutes, finding that the bridge issue was the proximate cause, and adding, "we, the jury, strongly recommend that CSX replace the Green Street Bridge."

The trial judge subsequently issued a written order holding there was no proximate causal link between CSX's failure to repair the Green Street Bridge and the fatal accident. Plaintiff contends this was incorrect. We disagree. As the Court said in 1942:

> The question always is, Was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies that might arise.
>
> *Pfaehler v. Ten Cent Taxi Co.*, 198 S.C. 476, 18 S.E.2d 331 (1942).

There was no "continuous operation" linking the destroyed bridge and the fatal accident. The finding of no proximate cause is affirmed.[3]

---

**3.** Although not raised by the parties, we are constrained to address several issues raised by the procedures followed here. First, we question whether a violation of 3420 gives rise to an action under 3980/3990. While 3420 imposes a duty on railroads to construct bridges in a safe manner, *e.g. Rembert v. South Carolina Ry. Co.*, 31 S.C. 309, 9 S.E. 968 (1889), and to maintain those bridges so that they may be safely traversed, *e.g. Thompson v. Seaboard Air Line Ry.*, 78 S.C. 384, 58 S.E. 1094 (1907), there is no explicit requirement in that statute that a railroad maintain a bridge in perpetuity. We therefore question whether the failure to repair the Green Street Bridge was a "wrongful act." In any case, precedent establishes that a traveler injured by a railroad's breach of a statutory duty imposed by 3420 has an ordinary negligence claim, rather than a 3980/3990 claim. *Compare Rembert, supra; Thompson, supra.*

Sections 3980 and 3990 appear to provide a remedy where a railroad's violation of a statutory duty imposed by the General Railroad Law does not result in tortious injury. *See, e.g., Foggie v. CSX Transp., Inc.*, 313 S.C. 98, 431 S.E.2d 587 (1993) (removal of crossing connecting two parcels bisected by railroad is obstruction of way in violation of § 58–17–1330 compensable under 3980/3990); *Kinsey v. Southern Ry. Co.*, 174 S.C. 192, 177 S.E. 149 (1934) (action for damages under 3980 for excessive fare charge in violation of § 58–17–1990); *compare Medlin v. Southern Ry. Co.*, 143 S.C. 91, 141 S.E. 185 (1928) (3980 not applicable where passenger treated tortiously by conductor).

Further, it appears that the proper reading of 3980 and 3990 is that 3980 gives rise to an action for damages, triable to a jury, and that 3990

## CSX'S APPEAL

CSX raises a number of issues on appeal, including claims that it was entitled to a directed verdict on both of Plaintiff's negligence theories, that a number of evidentiary errors require a new trial absolute, and that, at the very least, the punitive damages award cannot stand in light of the United States Supreme Court's intervening decision in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). We find merit in CSX's assertion of reversible error arising from Plaintiff's Green Street Bridge repair claim, and find that several other evidentiary rulings prejudiced CSX. Further, we hold that the United States Supreme Court's decision in *Campbell* requires, even in the absence of other errors, that a new punitive damages hearing be held. *See Durham v. Vinson*, 360 S.C. 639, 602 S.E.2d 760 (2004). We address CSX's appellate issues below.

## BRIDGE REPAIR

 CSX argues that the admission before the jury of evidence relevant only to the bridge replacement issue, and Plaintiff's use of this evidence in closing argument, were so prejudicial that reversal is mandated. We agree.

We have previously referred to the bridge repair testimony from numerous witnesses, none of which was remotely relevant to the negligence issues before the jury. In addition, Plaintiff's closing argument posited the question, "Where is the beginning for [decedent's] death?" and answered it in this way:

For Susan Webb though, the real beginning was 1998, July 12th, 1998. The date is when the bridge that provided access to their little community burned. And CSX had a legal obligation because the law required it. Code section 58–15–3420[sic] required them, if the railroad came there

simply gives the circuit court authority to impose equitable remedies (i.e. injunctions) in an action for damages brought pursuant to 3980. To read the statutes as the parties here did, to require the judge to hear the suit in equity and then award money damages, would raise a constitutional question. *See* S.C. Const. art. I, § 14 (right to jury trial); *see e.g. Lester v. Dawson*, 327 S.C. 263, 491 S.E.2d 240 (1997) (the right to a jury trial generally depends on whether an action is legal or equitable).

and there was a street there and the railroad crossed that street and the street had to come over it; and if they built a bridge, which they did, they had the legal obligation to repair that bridge.

And you know, the bridge burned July 12th and CSX—and I'm going to get my glasses out, because I can't see that screen without it—the bridge burned at that time. And the newspaper reported that Mr. Clark, you remember Tom Clark, the CSX bridge engineer said they had a legal obligation to repair that bridge. And the article states that July 12th—"The bridge burned July 12th and would be rebuilt, CSX Railroad's bridge engineer said Monday. Materials to reconstruct the bridge at Lopez and Green Streets to original specifications have been ordered and should be available in 30 days."

And you will recall that the testimony was that Mr. McClure, as it states there in the article, asked them to replace this bridge and talked with them, talked with the bridge engineer or bridge department. And they said that after you asked it, they apparently changed their mind. He said it wasn't in the budget. They weren't going to do it, even though they acknowledged their legal duty, the statute required them to do it, they decided, we're not going to do it. They even went so far as to have this material shipped to Pelzer. It was on a side track there to Pelzer to repair the bridge.

Then they made a decision not to do it. They weren't going to do it. Why do you think they weren't going to do it? Because of money. They didn't want to spend the money. They took this money and put it elsewhere when they could have provided the access, the ingress and egress to that community that would not have required them to use this dangerous railroad crossing that was .2 miles away.

Now, they had had a—the railroad, the testimony was, if you will recall the testimony, wanting to get out of their obligation to maintain railroad bridges, which the law required them to do. They can get out of it by making a settlement with the county as they did with the SCDOT. They pay the money, get out of this obligation. But they didn't want to pay any money, but they didn't want the obligation. . . .

Although the jury was not charged on 3420, its "advisory interrogatory" indicates it was profoundly and prejudicially affected by the bridge repair evidence and by Plaintiff's closing argument. The trial judge's ultimate correct conclusion that the failure to replace the bridge was not a proximate cause of the accident renders all this evidence and argument irrelevant, to the extreme prejudice of CSX. We hold that these circumstances require a new trial absolute, but briefly. address the merits of several of CSX's other appellate issues, which involve issues that may arise on retrial.

## DIRECTED VERDICT

Plaintiff alleged two different acts constituted negligence on the part of CSX: the failure to the engineer to sound the train's whistle for 1,500 feet before the crossing ("short horn"), and CSX's failure to control vegetation around the crossing, thereby obstructing motorists' views ("sight line"). CSX argues the judge erred in failing to grant a directed verdict in its favor, arguing Plaintiff produced insufficient evidence to support a liability finding on any theory. We disagree.

In ruling on directed verdict motions, the trial court must view the evidence and its reasonable inferences in the light most favorable to the non-moving party. An appellate court will reverse the trial court's ruling only when there is no evidence in the record to support it. *Jinks v. Richland County*, 355 S.C. 341, 585 S.E.2d 281 (2003).

### A. Short Horn

South Carolina Code Ann. § 58–15–910 (1976) requires a train sound its bell and whistle beginning 1,500 feet before a crossing and continuing until the engine has crossed the intersection. CSX concedes the engineer did not sound the horn for 1,500 feet before the Jordan Street Crossing, but rather did so for only 564 feet. Mrs. Medlin, the driver, testified she did not hear the horn, and Plaintiff offered testimony from an expert that given the sound proofing in the automobile and the fact that the windows were rolled up and the air conditioning on, the whistle was inaudible to Mrs. Medlin at any distance. Finally, Plaintiff offered a witness

who testified the train "tooted" only twice before entering the crossing.

If a railroad fails to give the required signals at a crossing, and this failure contributes to an injury, then the railroad is liable for all damages. S.C.Code Ann. § 58–17–1440 (1976). Here, the jury could have found, based upon Mrs. Medlin's testimony, that the engineer failed to sound the horn. Further, despite the audiologist's testimony that the car passengers could not have heard the horn, the jury could have found that had the horn been sounded, Mrs. Medlin would have heard it. *See, e.g., State v. Johnson,* 66 S.C. 23, 44 S.E. 58 (1903) (jury may properly disregard expert testimony).

The directed verdict was properly denied on the "short horn" theory. *Jinks, supra.*

## B. Sight Line

Plaintiff presented testimony from several witnesses that overgrown vegetation at the Jordan Street Crossing obstructed drivers' views at the time of the accident. Plaintiff also introduced photos and videos taken within twenty-four hours after the accident demonstrating the conditions at the crossing. CSX claims, however, that since it was not shown that a regulatory agency had deemed the vegetation at that crossing unacceptable on the day of the accident, a directed verdict should have been granted. We disagree.

■ South Carolina Code Ann. § 58–17–1450 (1976) requires county supervisors to inspect railroad crossings at least once a year, and to give written notice to the railroad of any dangerous conditions. Section 58–17–1350 requires the railroad to maintain all grade level crossings located in a municipality in a safe manner and permits municipal officers to order modifications to the crossing. In *Armitage v. Seaboard Air Line Ry. Co.,* 166 S.C. 21, 164 S.E. 169 (1932), the plaintiff alleged that the railroad had not maintained safe crossings as required by statutes, and that this failure resulted in the plaintiff's decedent's death at a crossing. The trial judge directed a verdict because there was no evidence that the condition of the crossing contributed to the accident. On appeal, the Court first noted that the plaintiff failed to specify which statute the railroad allegedly failed to observe. Spec-

ulating that it may have been the predecessor to § 58–17–1450 or § 58–17–1350, the Court noted there was no evidence that the railroad had failed to comply with any governmental order to improve the crossing. CSX contends *Armitage* stands for the proposition that it is insulated from liability for crossing accidents so long as it is in compliance with all regulatory requests. We disagree.

In *Crawford v. Atlantic Coast Line R. Co.*, 179 S.C. 264, 184 S.E. 569 (1936), decided four years after *Armitage,* the Court asked whether § 58–17–1350 (also cited in *Armitage*) merely codified the railroads' common law duty to maintain a safe crossing or whether it created a statutory duty coexisting with the common law duty. *Crawford* was concerned with breach of duty and negligence and not with regulatory issues. We do not read *Armitage* to limit railroad crossing liability·to situations where a railroad was on notice of an unsafe condition by virtue of an official government report. Rather, the *Armitage* Court, having been left to speculate as to the plaintiff's theory, was merely highlighting the lack of evidence of breach of any duty. Pursuant to *Crawford,* the railroad's negligent failure to maintain a safe crossing violates a statutory duty regardless whether there has been any regulatory action.

There was evidence that CSX's failure to control the weed growth at the Jordan Street crossing rendered that intersection unsafe. The directed verdict was properly denied. *Jinks, supra.*

## EVIDENTIARY ISSUES

CSX complains of numerous evidentiary errors allegedly committed by the trial judge. CSX points out that a number of these alleged errors occurred as the result of the trial court's refusal to bifurcate liability and punitive damages. CSX failed to appeal from the bifurcation order, and therefore the propriety of that ruling is not before us. *E.g., S.C. Coastal Conserv. League v. S.C. Dep't of Health and Enviro. Control,* 363 S.C. 67, 610 S.E.2d 482 (2005) (unappealed ruling, whether correct or not, is law of the case).

### A. Subsequent Remedial Measures

In 2000, CSX initiated an aggressive program to clear cut all passive crossings. The Jordan Street Crossing was clear

cut shortly before trial. At the *in limine* hearing,[4] CSX sought to exclude evidence that this crossing had been clear cut, contending it was inadmissible as a subsequent remedial measure under Rule 407, SCRE. Plaintiff argued the clear cutting was "admissible to show that [CSX] should have done it [before the accident]," i.e., as proof of negligence. The trial judge ultimately decided to admit the evidence, relying upon in *Reiland v. Southland Equip. Serv., Inc.,* 330 S.C. 617, 500 S.E.2d 145 (Ct.App.1998).

■ Rule 407, SCRE provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

This rule permits admission of subsequent remedial measures only when necessary to demonstrate such things as ownership, control, impeachment, or feasibility of precautionary measures, if contested. These were not issues in this case. In *Reiland,* the Court of Appeals seems to have adopted a narrow view of Rule 407 and held that only measures taken in direct response to the accident qualify for exclusion under the rule. In our view, this narrow interpretation ignores the literal language of the rule. We hold that Rule 407 bars the introduction of any change, repair, or precaution that under the plaintiff's theory would have made the accident less likely to happen, unless the evidence is offered for another purpose.

■■ The evidence of the clear cutting of Jordan Street was inadmissible at this trial under Rule 407. There were numerous witnesses, photos, and two videos demonstrating the condition of the crossing on the day of the accident. The evidence of the clear cutting was not necessary for the jury to understand the conditions at the time of the accident. Whether this evidence alone would require reversal is a close ques-

---

4. It appears from other portions of the record that there was an agreement that the parties did not have to object to the admission of evidence ruled upon at the motion *in limine.*

tion. The sight line question was hotly contested, and to the extent this subsequent clear cutting evidence was used to show negligence, it prejudiced CSX. There can be no doubt, however, that the erroneous admission of the evidence coupled with the bridge repair evidence and argument requires a new trial. Whether this evidence may be admissible at a subsequent trial depends upon whether any of the exceptions in Rule 407, SCRE, applies.

## B. Computer Animation

A computer animation is admissible if it is: 1) authentic under Rule 901, SCRE; 2) relevant under Rules 401 and 402, SCRE; 3) a fair and accurate representation of the evidence; and 4) more probative than prejudicial under Rule 403, SCRE. *Clark v. Cantrell,* 339 S.C. 369, 529 S.E.2d 528 (2000). When an animation is admitted, the trial court is to give a cautionary instruction that the video represents only a recreation of one party's version of events, and may call attention to any assumptions upon which the recreation is based. *Id.* The trial court has broad discretion in determining whether to admit an animation, and its decision will be reversed on appeal only for an abuse of that discretion. *Id.*

CSX argues the trial court erred in admitting Plaintiff's computer animation of the accident because that animation did not fairly and accurately convey the accident and the accident scene. We disagree. Specifically, CSX complains because the animation shows the car stopped for only 4.8 seconds while the victim said she stopped for ten seconds, and because the vegetation is enhanced in the video. CSX has not shown an abuse of discretion. As for the vegetation, the jury heard testimony from several individuals about the vegetation at the crossing on the day of the accident and had a video from a rescue worker at the scene, and one taken by the Plaintiff the next day presented for comparison purposes. As for the length of the stop, the discrepancy was extensively explored before the jury.

We find no abuse of discretion in the admission of this animation. *Clark v. Cantrell, supra.*

## C. Other Crossings

 Plaintiff was permitted to introduce a compilation of approximately 200 "notices of deficiency" received by CSX from the South Carolina Department of Transportation over the period between 1995 and 2002. It is unclear at what point or on what ground the trial court admitted this exhibit. It is the appellant's burden to present a sufficient record for appellate review. *State v. 192 Coin–Operated Video Game Machines,* 338 S.C. 176, 525 S.E.2d 872 (2000). CSX has not met this burden with regard to the compilation, although we note these records would be relevant, if at all, only to punitive damages.

CSX also complains that Plaintiff's traffic engineering expert was erroneously permitted to testify in detail to two other lawsuits involving accidents at CSX crossings in South Carolina where the allegations were that sight lines were obstructed. CSX argued at trial these accident settings were too dissimilar to be probative. Plaintiff countered that evidence of the other crossing accidents was admissible on the issue of punitive damages. It appears from the record that extensive evidence of these accidents was admitted without any instruction limiting the jury to considering them in the context of punitive damages.

The trial judge erred in admitting evidence of other accidents at other crossings to prove this accident occurred as the result of CSX's negligence. The evidence may be admissible at a subsequent trial in aid of Plaintiff's punitive damages claim.

## D. NTSB Safety Recommendation

 CSX objected to the admission of a National Transportation Safety Board report made to the Federal Railroad Administration (FRA) on the grounds of relevance. Prior to that objection, CSX had permitted Plaintiff's expert to testify using the report for several pages without objection. Further, there was no contemporaneous objection to Plaintiff's reference to the report in its opening statement. CSX, by its untimely objection, waived its right to complain about this issue in this appeal. *Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35 (1996).

### E. FRA Report

CSX also argues the court erred in admitting a FRA report dated February 1998 because this report, while directed to CSX, did not address crossing maintenance. We agree with CSX that this evidence was not relevant to liability. We express no opinion on the extent it may be relevant to punitive damages under the standards announced in *Campbell*.

## PUNITIVE DAMAGES

CSX argues that the punitive damage award should be reversed because 1) it was unconstitutionally based on conduct unrelated to the Jordan Street Crossing accident; 2) the jury instructions were erroneous; 3) CSX's net worth was improperly used as a basis for the award; and 4) there was no evidence of unlawful, wanton, or reckless activity with regard to the Jordan Street Crossing.

### A. Directed Verdict

Taking the last issue first, CSX complains that the punitive damages issue should have been resolved by directed verdict or judgment notwithstanding the verdict because there was no clear and convincing evidence of recklessness or willfulness with respect to this accident and this crossing. We disagree.

There was no question but that the engineer failed to sound his horn for the statutorily prescribed distance, and there was evidence that the vegetation at the Jordan Street Crossing was so overgrown that a traveler had to pull onto the tracks to see whether a train was approaching. From this evidence alone, a jury could find that CSX was reckless in maintaining the crossing. The issue of punitive damages was properly submitted to the jury at this trial.

### B. Evidence

In *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), decided after the trial in this case, the United States Supreme Court discussed the constitutional limitations on the use of punitive damages to punish defendants for conduct not related to the harm suffered by the plaintiffs. Further, the Court cautioned

against punishing a defendant for conduct in another jurisdiction, even where that conduct was unlawful. In *Durham v. Vinson, supra,* this Court applied *Campbell* to a case tried prior to that decision and found the improper admission of a single piece of unrelated evidence required reversal.

It is clear that much of the evidence of acts in other jurisdictions, including CSX and other railroads, and of acts unrelated to crossing safety in South Carolina admitted in this trial is not constitutionally permissible under *Campbell.* We reverse the punitive damage award and instruct that on retrial, evidence sought to be admitted on the issue of punitive damages should be closely scrutinized for its relationship to the particular harm suffered by the Plaintiff.

### C. Net Worth

CSX complains the jury was erroneously allowed to focus on its net worth, citing to Plaintiff's closing argument. Since there was no contemporaneous objection, this issue is not preserved for appellate review. *Dial v. Niggel Assoc., Inc.,* 333 S.C. 253, 509 S.E.2d 269 (1998) (subject to very limited exceptions, a contemporaneous objection is required to preserve closing argument issue for appeal).

### *CONCLUSION*

The order denying Plaintiff relief on the § 58–17–3420 claim is affirmed. The jury verdicts are reversed, and the matter is remanded for a new trial.

AFFIRMED IN PART; REVERSED IN PART.

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.