2167

Mary B. HENDRIX, Respondent v.
EASTERN DISTRIBUTION, INC., Appellant.

(446 S.E. (2d) 440)

Court of Appeals

*Thomas A. Bright* and *M. Susan Elgin,* both of *Haynsworth, Baldwin, Johnson & Greaves,* Greenville, *for appellant.*

*Leonard J. Spooner* and *James G. Carpenter,* of *Thompson & Hutson,* Greenville, *for respondent.*

Heard Nov. 11, 1993.

Decided Apr. 4, 1994; Reh. Den. Aug. 5, 1994.

CONNOR, Judge:

Mary Hendrix brought an action against her former employer, Eastern Distribution, Inc., alleging, among other causes of action, breach of an employment contract and breach of contract accompanied by a fraudulent act. The circuit court denied Eastern's motion for a directed verdict on these two claims. The jury awarded Hendrix $47,375 actual and $150,238 punitive damages. Eastern appeals. We affirm.

On June 1, 1988, Hendrix began work for Eastern as a sales representative. At the beginning of her employment with Eastern, Hendrix signed a document prepared by Eastern's national sales manager, which provided in its entirety:

> TERMS OF EMPLOYMENT DATED MAY 25, 1988
> This Document is not a contract of employment, but detail [sic] in writing the items agreed to by Ed Collier and Mary Hendrix. The agreement was discussed on May 19, 1988 at Eastern Distribution, Inc. in the office of Ed Collier.
> 1. Date of employment will be June 1, 1988.
> 2. Starting salary shall be $21,000 per year, plus one (1) percent commission on all new accounts obtained from new customers solicited and signed by Mary Hendrix. The salary shall be paid weekly at a rate of $403.85 and commissions earned shall be paid at the end of each business quarter.
> 3. The starting salary shall be increased to $25,000 per year in six (6) months or $480.77 per week based on the performance of Ms. Hendrix. If performance level has been evaluated in three (3) months to be high and accounts have been generated, the increase will be enacted.
> 4. Mileage allowance will be at .21 cent [sic] per mile.

This memorandum represents the only written evidence of the agreed terms of her employment.

Eastern terminated Hendrix's employment on January 31, 1991, allegedly due to "economic conditions." Hendrix claimed, however, Eastern terminated her because it did not want to continue paying her commissions on accounts and contracts she had developed.

Neither party disputes the existence of a valid employment relationship, the terms of which are strongly disputed. The question before us is whether Eastern breached the contract by terminating Hendrix's employment. Both parties agree the document is not an employment contract. Rather, the document sets forth certain terms of the oral employment contract which is the subject of this action.

## I.

Eastern first argues the circuit court erred in failing to grant its directed verdict motions on the breach of contract and breach of contract accompanied by fraudulent act claims. We affirm.

Although Eastern made directed verdict motions at the close of Hendrix's case-in-chief, it failed to renew these motions at the close of all the evidence. This Court, therefore, is precluded from reviewing these issues on appeal. *Stokes v. Denmark Emergency Medical Services,* — S.C. —, 433 S.E. (2d) 850 (1993); *Baker v. Chavis,* 306 S.C. 203, 410 S.E. (2d) 600 (Ct. App. 1991). The rule that a judgment notwithstanding the verdict may not be granted unless the moving party moved for a directed verdict at the close of all the evidence is a strict one. *Smith v. Ridgeway Chemicals, Inc.,* 302 S.C. 303, 395 S.E. (2d) 742 (Ct. App. 1990). The rules which govern our appellate jurisdiction and determine which issues are preserved for appeal are equally strict.

## II.

Even if the issue were preserved for appeal, we affirm on the merits.

In reviewing the denial of a motion for a directed verdict, we must view the evidence in the light most favorable to Hendrix, the party opposing the motion. *Hope Petty Motors v. Hyatt,* — S.C. —, 425 S.E. (2d) 786 (Ct.

App. 1993). Viewing the record in this light, there is evidence from which the jury could reasonably infer that although Hendrix was an at-will employee, her employment contract precluded her termination in order for Eastern to avoid paying her commissions.

A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct. *Gaskins v. Blue Cross-Blue Shield of South Carolina,* 271 S.C. 101, 245 S.E. (2d) 598 (1978); *Moore v. Palmetto State Life Insurance Co.,* 222 S.C. 492, 73 S.E. (2d) 688 (1952). If an agreement is manifested by words, the contract is said to be express. *Thomas v. Lomar,* 82 Ga. App. 592, 61 S.E. (2d) 790 (1950). An oral contract is enforceable according to its terms. Disputed terms of a contract are issues of fact which are for the jury's determination.

In *Orsini v. Trojan Steel Corp.,* 219 S.C. 272, 276, 64 S.E. (2d) 878, 879 (1951), the Supreme Court stated:

> The general rule is that under ordinary circumstances a contract to furnish employment permanently, or so long as the employee's services shall be properly performed, or for a similar indefinite period, is no more than an indefinite hiring, terminable at the will of either party, and is therefore unenforcible [sic] *as to its duration.*

(Emphasis ours.) *See also Shealy v. Fowler,* 182 S.C. 81, 188 S.E. 499 (1936) (a contract for permanent employment, so long as it is satisfactorily performed, which is not supported by any consideration other than the obligation of service to be performed on the one hand and wages to be paid on the other, is terminable at the pleasure of either party). However, even if under an *Orsini* and *Shealy* "indefinite term" analysis Hendrix were an at-will employee, terminable at Eastern's pleasure, this does not end the inquiry.

The general rule is that an employer may terminate an at-will employee for good reason, no reason, or even bad reason. *Culler v. Blue Ridge Elec. Co-op., Inc.,* — S.C. —, 422 S.E. (2d) 91 (1992). However, in certain limited situations, an employer's discharge of an at-will employee may give rise to a cause of action for wrongful discharge. *Small v. Springs Industries, Inc.,* 300 S.C. 481, 388 S.E. (2d) 808 (1990) (*Small II*). Examples include those circumstances in which the at-will status of the em-

ployee is altered by the terms of an employee handbook, or in which the discharge violates a clear mandate of public policy. *Id. See also Leahy v. Starflo Corp.*, — S.C. —, 431 S.E. (2d) 567 (1993) (the Supreme Court found the employer altered the traditional at-will employment status by posting a policy statement requiring the employer to follow a four-step procedure prior to discharge; although the policy statement contained a disclaimer that the at-will status was not altered, other evidence indicated the employer waived the disclaimer); *Johnson v. American Ry. Exp. Co.*, 163 S.C. 191, 161 S.E. 473 (1931) (the employer altered the employee's at-will status through an agreement with a union that employees would not be terminated except for cause, and then only after an investigation); *Bookman v. Shakespeare Co.*, — S.C. App. —, 442 S.E. (2d) 183 (1994) (employee's at-will status was limited only by employer's sexual harassment policy, which stated employees "would be free from any and all reprisal or retaliation from filing" a sexual harassment complaint; employer was, therefore, free to fire employee for any reason or no reason except in retaliation for filing a sexual harassment complaint).

Hendrix testified Eastern Distribution "obviously . . . had a right to terminate me if they decided to." Nevertheless, she claims Eastern altered her at-will status when it hired her upon its assurances she would not be terminated so Eastern could avoid its agreement to pay her commissions. In other words, Eastern agreed while it could generally discharge Hendrix for any reason, no reason or even bad reason, it could not discharge her for one reason, that is, avoidance of paying her commissions on accounts she had developed. Whether this is why Eastern discharged Hendrix was a matter of fact for the jury to resolve, which it did, in Hendrix's favor.

In an action at law tried by a jury, the jurisdiction of this Court extends merely to correction of errors of law, and factual findings of the jury will not be disturbed unless a review of the record discloses there is no evidence which reasonably supports the jury's findings. *Townes Associates, Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E. (2d) 773 (1976).

Furthermore, it is the duty of the court to sustain a verdict when a logical reason for reconciling the verdict can be found. *Rhodes v. Winn-Dixie Greenville,*

*Inc.*, 249 S.C. 526, 155 S.E. (2d) 308 (1967); *see also New York Carpet World v. Houston*, 292 S.C. 101, 354 S.E. (2d) 924 (Ct. App. 1987) (a jury's verdict should be affirmed if it is possible to do so and carry into effect the jury's clear intention; it is the Court of Appeals' duty to uphold jury verdicts if they can be logically reconciled).

Hendrix testified the rumors she had heard of Eastern Distribution's policy of "hir[ing] good sales people . . . keep[ing] them until they build up good accounts, then . . . get[ting] rid of them" were discussed in several interviews with Ed Collier, then National Sales Manager for Eastern Distribution. Collier testified he was aware of the reputation Eastern Distribution had concerning their sales people, and had induced Hendrix to come to work for Eastern by assuring her things had changed. He testified:

Q. Did you learn of a reputation of Eastern Distribution relative to their sales people?
A. Yes.
Q. As a result of learning that reputation, did you make certain representations to Ms. Hendrix at the time of her employment?
A. Yes, I did.
Q. Would you tell us what representations you made to her?
A. I said to Ms. Hendrix upon time of employment that the reputation of Eastern Distribution has changed. New management has come in and that her position was secure and that we were trying to stabilize the work force.
Q. At what point in y'all's negotiations for her agreement to come to work did this conversation take place?
A. It came up twice in our interview, the first interview . . . and also after the employment.

Hendrix testified Collier assured her Eastern Distribution "was under a new management structure and with that new management structure the main emphasis was going to be to stabilize the sales force and to improve their image in the marketplace and, therefore, we were assured that maybe previous happenings wouldn't happen again." She went on to say

she would not have accepted employment with Eastern Distribution absent these representations by Collier.

Collier corroborated Hendrix's testimony:

> Q. As a result of your responding to her concerns did she then sign this agreement?
> A. Yes.

Moreover, Collier further testified he discussed the same concerns with Mike Ward, Eastern's president, when Collier negotiated his own employment earlier in 1988.

Michelle Stephens-Stokes, the "vice president"[1] hired as Hendrix's successor, also testified about Eastern Distribution's policy:

> A. I asked [Mike Ward] now that I was getting commissions was Mr. Segars [Eastern's owner] going to cut me. . . .
> Q. Why did you ask that question of Mr.—what did you mean was Mr. Segars going to cut you. . . .
> A. That is generally the way things are done, earn commissions and then you replace the salespeople.

Hendrix introduced a written memorandum from her personnel file. It is additional evidence the jury could have considered in ascertaining the terms of the oral contract and in evaluating the credibility of the witnesses concerning the conversations alleged to have taken place. It stated:

> I am informed of the accusations Mary Hendrix is making against Eastern Distribution. I am informed she has made such accusations in the past and Mr. Ward and Mr. Collier agree that they informed her that if she performed she indeed would not need to fear losing her position at the Company. . . .

Even if the jury found Hendrix's original employment agreement did not include the term that she would not be terminated in order to avoid paying her commissions, there was evidence from which the jury could have concluded the term was added later. Eastern admits other terms

---

[1]Stephens-Stokes' vice presidency is at the heart of the fraudulent act complained of by Hendrix, discussed in depth in Section V.

of the employment contract were modified as the employment relationship evolved. For example, one of the original contract's terms was that commissions would be paid quarterly. This term was orally amended to provide for monthly payment of commissions. In another amendment, Eastern Distribution agreed to pay a one percent commission on new business from "in-house" accounts, although they later reneged on this provision, when, as Ward testified, they made the "arbitrary" decision not to pay as agreed.

Hendrix repeatedly sought assurances Eastern would not terminate her in order to avoid paying her commissions.[2] She testified only a month before she was terminated Ward told her, "Mary, I hope to get to pay you $100,000 in commissions next year." Therefore, there was ample evidence from which the jury could have decided the contract was amended.

### III.

Eastern also argues there was no evidence on which the jury could have based its findings of the existence of a contract of employment or of actual damages. These precise arguments were not made in support of the new trial absolute motion Eastern made after the verdict, and accordingly were not ruled upon by the trial court.

Eastern's argument there was no evidence on which the jury could have found $47,375 actual damages is unfounded. Even if the award of actual damages were properly before this Court, the damages awarded were within the range of the evidence and therefore the verdict was not excessive as a matter of law. *See Hyload, Inc. v. Pre-Engineered Products, Inc.,* — S.C. —, 417 S.E. (2d) 622 (Ct. App. 1992).

Hendrix sought and presented evidence on three separate items of actual damage:

(1) Salary: Although Hendrix testified she was seeking one year's salary ($26,250), the jury could have awarded her one and one-half year's salary, recognizing that as of the date of

---

[2] I note the legislature is not unaware of the potential for abuse where commissions comprise a large part of an employee's compensation. Accordingly, as an expression of public policy of this state, it enacted S.C. Code Ann. §§ 39-65-10 through 80 (Supp. 1993), which creates civil liability for a principal's failure to pay commissions. Although Hendrix's complaint included a cause of action under this statute, the jury found Eastern Distribution was not a principal as defined by the statute.

trial, one and one-half years later, Hendrix testified she was still unemployed.[3] One and one-half year's salary at this rate equals $39,375.

(2) Pre-termination commissions from two "house" accounts she serviced: House accounts were accounts that existed when Hendrix was hired. Hendrix described the work needed to "restore" house accounts as being more time-consuming than soliciting new business. She testified:

> [I]t describes a relationship with the customer where you had business in the past but for — and in this case reasons where the customer had serious problems, customer service problems and so forth with Eastern and told me and understood they were not going through, they were not doing any active business with the company. You have to go in, you have to convince them that at that time we were told to say we are under new management structure, to give us another chance, let us prove ourselves to you. And give us a chance to restore where that business relationship. . . .

Although Eastern's president denied agreeing to pay commissions on house accounts, Hendrix testified otherwise. The jury could have believed Hendrix. The amount of revenues was undisputed. One percent of the total revenues generated by the two house accounts prior to Hendrix's termination equals $1,399.68.

(3) Post-termination commissions on all accounts she negotiated while employed with Eastern: Hendrix introduced evidence showing post-termination revenues generated by her totalling$751,191 through March 1992, near the time of trial. One percent of $751,191 equals $7,511.91.

The total of these three amounts ($39,375 + $1,399.68 + $7,511.91) equals $48,286.59, which is approximately $1,000 *more* than the actual damage award by the jury. In *Small v. Springs Industries, Inc.*, 300 S.C. 481, 484, 388 S.E. (2d) 808, 810 (1990) (*Small II*), the Supreme court noted "[a] wrongfully discharged employee suing for breach of contract is enti-

[3]Hendrix's attorney invited the jury to award her one and one-half year's salary during his closing argument, noting "when we first started putting this together we had been, it had been a year since she had been unemployed, it is year and a half if you want to award her year and half, three year's salary, that is fine. . . ." Eastern's attorney did not object.

tled to receive the amount of the employee['s] net losses caused by the employer's breach. Such losses may include back pay as well as future damages" (citations omitted). As in *Small II*, the jury in this case was instructed that a plaintiff in a breach of contract action is not entitled to conjectural or speculative damages. The jury award here was well within the range of the evidence; this court is therefore required to affirm. *See id.* at 488, 388 S.E. (2d) at 812.

## IV.

Eastern further claims "the record contains no evidence of a binding contract of employment, other than at-will employment." This statement assumes an at-will employment contract is not a contract at all. Moreover, Eastern argues the "Terms of Employment" document is nothing more than a confirmation of an offer of a position. The document recites "This Document is not a contract of employment, but detail [sic] in writing the items agreed to. . . ." Hendrix testified she knew the document was "not a contract." However, saying the document was not an employment contract is quite different from saying the document does not recite explicit terms which make up the employment contract.

## V.

Eastern next argues the trial court erred in denying its motion for directed verdict as to Hendrix's claim for breach of contract accompanied by a fraudulent act. Eastern asserts Hendrix failed to establish all of the essential elements of that cause of action. However, Eastern did not state the specific grounds for its motion as required by Rule 50(a), SCRCP. At trial, Eastern's only argument in support of its directed verdict motion was that Hendrix "has not proven by clear and convincing evidence that she is entitled to a verdict on the basis of fraud." The action for breach of contract accompanied by a fraudulent act is not based on the same elements as the action in tort for fraud and deceit. *Mendelsohn v. Whitfield*, — S.C. —, 430 S.E. (2d) 524 (Ct. App. 1993); *Harper v. Ethridge*, 290 S.C. 112, 348 S.E. (2d) 374 (Ct. App. 1986). It was incumbent upon Eastern to argue specifically which element of reach of contract accompanied by a fraudulent act was not established to give the trial court the opportunity to rule on the point.

Even if this point had been preserved for our consideration, the jury's verdict is supported by competent evidence. To establish the claim for breach of contract accompanied by a fraudulent act, Hendrix had to prove 1) a breach of contract, 2) fraudulent intent related to the breach, and 3) a fraudulent act directly connected to the breach. *Foxfire Village, Inc. v. Black & Veatch, Inc.*, 304 S.C. 366, 404 S.E. (2d) 912 (Ct. App. 1991), *cert. denied.*

Eastern's entire argument on each of the three elements is based on the existence of pure employment at-will as opposed to enforcement of the terms of the contract the jury found existed. Again, viewing the evidence most favorably to Hendrix, the record contained evidence from which the jury could have reasonably found the existence of all three elements.

1. Breach of Contract: The jury awarded actual damages on the breach of contract cause of action, thereby confirming its finding that the breach occurred.

2. Fraudulent Intent: The jury could reasonably infer a fraudulent intent from several circumstances relating to the breach. *Floyd v. County Squire Mobile Homes, Inc.*, 287 S.C. 51, 336 S.E. (2d) 502 (Ct. App. 1985). The record contains the testimony of Hendrix, as well as several other witnesses, that Eastern had a policy of terminating sales staff just as they were beginning to earn commissions. In addition, the record contains charts and graphs from which the jury could reasonably infer this is Eastern's policy.

3. Fraudulent Act: The fraudulent act is characterized by dishonesty in fact, unfair dealing, or unlawful appropriation of another's property by design. *Id.* The fraudulent act

> assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence.

*Sullivan v. Calhoun*, 117 S.C. 137, 139, 108 S.E. 189, 189 (1921) (citations omitted). The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract. *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 54, 336 S.E. (2d) 502, 504 (Ct. App. 1985).

There is evidence the entire sequence of events involving the hiring of Michelle Stephens-Stokes, rather than the hiring itself, constitutes a fraudulent act. Eastern terminated Hendrix on January 31, 1991, allegedly because of "economic conditions." Hendrix testified, however, Eastern terminated her because it did not want to continue paying her commissions on accounts and contracts she had developed.[4] Eastern claimed in terminating Hendrix it was eliminating its sales force entirely. Eastern subsequently hired Stephens-Stokes in a sales capacity, but gave her the title of vice president. Eastern's president, Mike Ward, explained: "I think simply the fact that having to go to court and the potential in that I hired another salesperson would not go good for me." When cross-examined as to what the vice presidency entailed, Ward admitted Stephens-Stokes did not attend any meetings of the officers of the corporation, did not manage anybody, was not head of a department, and did not own any stock or interest in the corporation. Stephens-Stokes, when questioned as to whether she had any duties other than sales answered "I could fix the copy machine better than most anybody else there," and that she "wanted to drive a forklift but they never would let [her]." There is evidence from which the jury could infer Stephens-Stokes was hired to replace Hendrix. Although the act of hiring Stephens-Stokes was separate and distinct from the act of terminating Hendrix, it was closely connected to it. *Cf. Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 336 S.E. (2d) 502 (Ct. App. 1985).

## VI.

Eastern argues the trial court erred in denying its motion for new trial *nisi remittitur* "because the jury's award of actual damages for breach of contract was irrational. . . ." At trial, Eastern made the following motion after the verdict:

---

[4]Collier also testified concerning the process of becoming a productive salesperson:

You have to cultivate accounts, you have to research their needs. It takes time to generate and get the confidence of a company to do business with your company. Through that period of conversation, visits, letters, phone calls, you will eventually get their confidence and hopefully get them to come see your facility. That is just the basis of starting it and it usually takes bar none at least a year to get a substantial account that would generate good revenue for a company. . . .

"We also move for absolute new trial on the grounds of the verdict contrary to law and evidence in the case, especially with regard to actual damages, breach of contract." The trial court immediately denied the motion. Ten days later Eastern filed a written "Motion for New Trial *Nisi* (Remittitur)." The trial court subsequently denied that motion as well.

A motion for new trial *nisi remittitur* asks the trial court in its discretion to reduce the verdict because it is "merely excessive," although not motivated by considerations such as passion, caprice or prejudice. *O'Neal v. Bowles*, — S.C. —, 431 S.E. (2d) 555 (1993). If the amount of the verdict is grossly excessive so as to be the result of passion, caprice, prejudice or some other influence outside the evidence, the trial judge must grant a new trial absolute, not a new trial *nisi remittitur*. *Id*. The denial of this motion is within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. *Id*. The record supports the trial court's ruling. There was no abuse of discretion.

## VII.

Finally, Eastern challenges the trial court's review of the punitive damages award, claiming the review was inadequate under *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E. (2d) 350 (1991). The trial court issued a detailed order analyzing the case under the factors set forth in *Gamble*. In *Gamble*, the Supreme Court noted the amount of punitive damages remains largely within the discretion of the jury, as reviewed by the trial judge, and the Court adhered "to the precedent that this Court's review is limited." *Id*. at 112, 406 S.E. (2d) at 355. There was no abuse of discretion in this case.[5]

Affirmed.

SHAW, J., concurs.

BELL, J., concurs in separate opinion.

BELL, Judge (concurring):

---

[5]The punitive damages award of $150,238 apparently represents the jury's attempt to punish Eastern by taking away the profits it made as a result of Hendrix's contributions. The amount represents twenty percent of $751,191, the amount of post-termination revenues claimed to have been generated by Hendrix.

I join in Parts I, VI, and VII, of Judge Connor's opinion and vote to affirm on that basis alone. I do not read Judge Connor's remaining analysis to suggest that *Orsini v. Trojan Steel Corp.*, 219 S.C. 272, 64 S.E. (2d) 878 (1951), is not the law in South Carolina. *Orsini* holds that, under ordinary circumstances, a contract to furnish employment so long as the employee's services shall be properly performed, or for a similar indefinite period, is no more than an indefinite hiring, terminable at the will of either party. The termination of an at-will employee does not normally give rise to an action for breach of contract. *Small v. Springs Industries, Inc.*, 300 S.C. 481, 388 S.E. (2d) 808 (1990).