735 S.E.2d 505

**Willie Homer STEPHENS, Guardian ad Litem
for LILLIAN C., a minor, Appellant,**

v.

**CSX TRANSPORTATION, INC. and the South Carolina
Department of Transportation, Respondents.**

No. 5008.

Court of Appeals of South Carolina.

Heard May 7, 2012.
Decided July 25, 2012.
Rehearing Denied Dec. 11, 2012.

504

506

508

John E. Parker, J. Paul Detrick, Grahame E. Holmes, and Matthew V. Creech, Peters, Murdaugh, Parker, Eltzroth & Detrick, P.A., of Hampton, Carl H. Jacobson, Uricchio, Howe, Krell, Jacobson, Toporek, Theos & Keith P.A., of Charleston, for Appellant.

J. Arthur Davison and James W. Purcell, Fulcher Hagler, LLP, of Augusta, Georgia, Ronald K. Wray, II and Thomas Vanderbloemen, Gallivan, White & Boyd, P.A., of Greenville, for Respondent CSX Transportation, Inc.

Andrew F. Lindemann, Davidson & Lindemann, P.A., of Columbia, Peden B. McLeod, McLeod Fraser & Cone, LLC, of Walterboro, for Respondent South Carolina Department of Transportation.

FEW, C.J.

This is an appeal from a defense verdict in a personal injury action involving a collision between a train and an automobile at a railroad crossing. Willie Stephens argues the trial court erred in excluding evidence of measures taken by CSX Transportation, Inc., after the collision, in denying his motions for partial directed verdict and JNOV, and in charging the jury. We affirm.

## I. Facts

CSX maintains a railroad track in Hampton County. As the track passes through the town of Yemassee, it runs parallel to state Highway 68 and crosses Hill Road, a two-lane road that terminates at Highway 68 just a few feet from the crossing. The Hill Road crossing is a passive grade crossing, meaning it has no active traffic-control devices, such as lights or gates.

Vehicle traffic is controlled by a stop sign, a stop line, and a cross-buck.[1]

In 2000, CSX started a program to improve sight distances for vehicles approaching its passive grade crossings in South Carolina by removing vegetation at the crossings. Several months before this accident, CSX's clear-cutting crew reached the Hill Road crossing. When the crew attempted to cut down a line of trees on land adjacent to the crossing, they encountered Thomas Jackson. Jackson claimed he owned the land and CSX had no right to cut down the trees. The crew did not cut down the trees. CSX's policy was that in the event of a dispute with a landowner, the crew would not remove vegetation until the dispute was resolved. CSX eventually showed Jackson that it owned a right of way over the land on which the trees were located, and its crew removed them. However, the trees were still in place on the day of the accident.

On February 3, 2004, as Tonia Colvin drove down Hill Road towards Highway 68, a CSX train approached the crossing from her right. Tonia's boyfriend sat in the front passenger's seat, and her twelve-year old daughter Lillian sat in the back seat. When Tonia reached the crossing, she stopped at the stop sign. She pulled forward to the stop line and stopped again. Her line of sight in the direction of the train ran across the property Jackson claimed he owned. Tonia testified that she did not hear or see the train before she drove onto the track. As she did so, she heard the train's horn. She tried to get out of the way by accelerating, but the train struck her vehicle.

South Carolina law requires that a train's horn be sounded continuously from a distance of at least 1,500 feet from the road until the engine has crossed it. The train's engineer testified he "believed" he blew the horn on time, but the train's event recorder showed he did not blow the horn until the engine was 1,161 feet from the crossing. CSX took varying positions on whether it complied with the require-

---

1. A cross-buck is a white, "X-shaped sign with the words 'Railroad Crossing' in black lettering." It "is considered the same as a 'Yield' sign." *Webb v. CSX Transp., Inc.*, 364 S.C. 639, 644 n. 1, 615 S.E.2d 440, 443 n. 1 (2005).

ment, but eventually stipulated that the data from the event recorder was accurate.

Tonia, her boyfriend, and Lillian were all injured in the accident. Lillian's injuries were devastating. She sustained severe brain injuries, requiring that doctors place her in a medically induced coma and drill a hole in her skull to alleviate pressure on her brain. When Lillian awoke from the coma approximately one month later, she could not speak, walk, or feed herself. Her injuries required months of physical, occupational, and speech therapy, but even at the time of the trial over four years later, she continued to suffer severe intellectual, behavioral, and physical impairments.

## II. Procedural History

Acting on behalf of Lillian, Stephens sued CSX and the state Department of Transportation for negligence. Stephens' primary claims of negligence as to CSX were that it failed to sound its train's horn far enough in advance of the crossing and that it failed to remove trees and other vegetation that obstructed Tonia's view of the track. As to DOT, Stephens claimed it failed to properly inspect the crossing and installed the stop sign and stop line at improper locations.

At trial, after both defendants had presented their evidence, Stephens moved for a partial directed verdict against CSX. Stephens asked the trial court to hold CSX breached its duty of reasonable care and to have the jury decide proximate cause and damages. The trial court denied the motion. Stephens then presented evidence in reply, including the stipulation with CSX that the data from the train's event recorder was accurate. He rested without renewing his motion for directed verdict.

The verdict form contained special interrogatories, which first asked whether CSX or DOT breached its duty of reasonable care. The jury answered both questions "No" and did not answer any of the other questions on the form. Stephens filed a motion for JNOV, renewing his request for judgment as a matter of law on CSX's breach of duty. He also asked for a new trial on grounds that the trial court erroneously excluded evidence and erred in charging the jury. The trial court denied the motions.

▮▮▮▮▮▮▮▮▮▮▮▮

### III. Evidentiary Rulings

Stephens sought to admit evidence of two actions taken by CSX after the accident: (1) CSX removed the trees at the Hill Road crossing that Thomas Jackson claimed CSX had no right to remove, and (2) CSX removed vegetation planted at a different location on the railroad right of way, despite opposition by members of a local garden club. In separate rulings, the trial court sustained CSX's objections to testimony regarding these actions on the basis that the actions were subsequent remedial measures and thus inadmissible under Rule 407, SCRE. We affirm both rulings.

### A. Removal of Trees at the Hill Road Crossing

▮▮ One of Stephens' theories of liability as to CSX was that the trees CSX failed to remove interfered with the proper sight distance, so that a driver on Hill Road could not see an approaching train. Stephens argued that if the trees had not been there, or more particularly if CSX had cut the trees before the accident, there would have been sufficient sight distance and the crossing would have been reasonably safe. He claimed that CSX's failure to cut the trees was a breach of its duty to maintain a reasonably safe crossing. CSX argued in response that the crossing was reasonably safe even with the trees. On this point, Stephens presented testimony from Jackson about CSX's efforts to cut the trees before the accident. Without objection, Jackson testified he "rais[ed] hell" and CSX agreed not to cut them. Stephens also attempted to elicit testimony from Jackson that CSX cut the trees shortly after the accident. The trial court excluded the testimony of the subsequent measure under Rule 407.

Rule 407 provides that "evidence of . . . subsequent [remedial] measures is not admissible to prove negligence or culpable conduct in connection with the event." The central inquiry under Rule 407, therefore, is the purpose for which the evidence is offered. If the proponent of the evidence offers it for the purpose of proving negligence or culpable conduct, Rule 407 excludes it. However, the rule also provides that it "does not require the exclusion of evidence of subsequent measures when offered for another purpose." *See also Webb,* 364 S.C. at 653, 615 S.E.2d at 448 ("Rule 407 bars the introduction of any change, repair, or precaution that under

the plaintiff's theory would have made the accident less likely to happen, unless the evidence is offered for another purpose."). Permissible purposes include, as the rule provides, "proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

At trial, Stephens argued his purpose for introducing evidence of the tree removal was to "impeach" CSX's position that the Hill Road crossing was reasonably safe even with the trees in place. He argued the evidence was admissible because "[i]f [the crossing] was safe, it didn't need cutting. The fact that [CSX] came back later and cut it impeaches their position . . . ." It is the trial court's responsibility to determine whether the proponent is offering the evidence for the prohibited purpose of proving negligence or culpable conduct, or is offering it for some other purpose. *Webb* requires the trial court to consider Stephens' argument as to his purpose for offering the evidence in light of his theory of the case, which was that CSX's duty of reasonable care required it to cut the trees, and therefore the crossing was not reasonably safe because CSX was negligent. 364 S.C. at 653, 615 S.E.2d at 448 ("Rule 407 bars the introduction of any change, repair, or precaution that *under the plaintiff's theory* would have made the accident less likely to happen . . . ." (emphasis added)). The trial court correctly saw past the "impeachment" label Stephens put on the evidence and determined that his purpose for admitting the evidence was to prove that the crossing was not safe because CSX was negligent in failing to cut the trees. By offering the evidence to "impeach" CSX's position that the crossing was safe, Stephens was actually attempting to prove that CSX's negligence in failing to cut the trees was the reason the crossing was not safe. The admission of the evidence for that purpose is precisely what Rule 407 forbids. The trial judge properly excluded the evidence under Rule 407.

 On appeal, Stephens presents a different argument. He now claims his purpose for offering the evidence was to show that Jackson's opposition to cutting the trees was not the reason CSX failed to cut them. He argues that CSX's decision to cut the trees after the accident shows that CSX had the right to cut them before the accident, which means Jackson's opposition could not be the reason CSX failed to act

sooner. Stephens thus argues that the purpose of offering the evidence was not the prohibited purpose of proving CSX was negligent, but the permitted purpose of impeaching the testimony of a CSX witness who testified that it was Jackson's opposition to the trees being cut that prevented CSX from cutting them beforehand. His argument also goes to the "feasibility of [the] precautionary measure[ ]" of cutting the trees. If Stephens had presented this argument to the trial court, the court might have exercised its discretion to admit the evidence.[2] A trial court's broad discretion to decide evidence questions would have allowed it to determine whether the evidence violated Rule 407 or was legitimately offered for a purpose permitted under the rule. However, a party "may not argue one ground on the admissibility of evidence at trial and an alternate ground on appeal." *Pike v. S.C. Dep't of Transp.*, 332 S.C. 605, 615, 506 S.E.2d 516, 521 (Ct.App.1998). Because Stephens did not present this argument to the trial court, the court was not given the opportunity to exercise its discretion as to that argument, and the argument is not preserved for appeal.

### B. Removal of a Garden in Hampton

 Stephens also attempted to introduce evidence regarding the removal of vegetation at a different crossing. Several months after the accident, CSX removed a public garden in Hampton that was planted in CSX's right of way near the other crossing. Stephens offered the testimony of two members of a local garden club who opposed the removal of the garden on the grounds that it did not obstruct sight. Stephens offered the testimony for the purpose of contradicting CSX's position that its dispute with Jackson caused the delay in removing the trees at the Hill Road crossing. The

---

2. Stephens insists he did present this argument, citing his lawyer's statement at trial: "The fact that [CSX] came back and cut it impeaches their position...." In context, however, it is clear that the position to which this statement referred was the safety of the crossing with the trees in place:

> in [CSX's] opening statement—by the opening statement saying this crossing was safe, it didn't need cutting, is what he said in the opening statement, it was only—it was safe, but we wanted to make it safer. If it was safe, it didn't need cutting. The fact that they came back later and cut it impeaches their position....

trial court excluded the testimony under Rule 407. We find Rule 407 does not exclude this testimony because removing a sight obstruction at a different crossing was not a "measure[ ] . . . which, if taken previously, would have made the event less likely to occur." Rule 407, SCRE. Thus, by its own terms, the rule does not apply to this evidence. *See Webb,* 364 S.C. at 653, 615 S.E.2d at 448 ("Rule 407 bars the introduction of any change, repair, or precaution that . . . would have made the accident less likely to happen. . . .").

However, we affirm the exclusion of the testimony. First, we question whether it is relevant. *See* Rule 402, SCRE ("Evidence which is not relevant is not admissible."). The garden club members opposed the removal of the garden on an entirely different basis than the ownership-based objection Jackson asserted. Second, for this reason and because it relates to a collateral matter, even if it is relevant the evidence had almost no probative value. *See* Rule 403, SCRE (stating "evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury, or by considerations of undue delay, [or] waste of time"). In any event, the exclusion of the evidence caused Stephens no prejudice. *See Fields v. Reg'l Med'l Ctr. Orangeburg,* 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005) (holding appellant must show prejudice from admission of evidence to warrant reversal).

### IV. Denial of Motions for Partial Directed Verdict and JNOV Against CSX

█ Stephens argues the trial court erred in denying his motion for partial directed verdict. We find this issue is not preserved.

█ When a party moves unsuccessfully for directed verdict at any point during a trial, "he must renew that motion at the close of all evidence." *Wright v. Craft,* 372 S.C. 1, 19, 640 S.E.2d 486, 496 (Ct.App.2006). "Otherwise, this court is precluded from reviewing the denial of the motion on appeal." 372 S.C. at 20, 640 S.E.2d at 496. Stephens made his motion for partial directed verdict when both defendants rested, and the trial court denied the motion. Stephens then introduced evidence in reply. However, he did not renew his directed

verdict motion after he presented that evidence. Therefore, the denial of his directed verdict motion is not preserved for our review.

 After the trial, Stephens filed a motion for JNOV and a new trial, raising the same points he argued in his directed verdict motion. However, because he had not renewed his directed verdict motion after presenting evidence in reply, he could not obtain JNOV. "When a party fails to renew a motion for a directed verdict at the close of all evidence, he waives his right to move for JNOV." *Wright*, 372 S.C. at 20, 640 S.E.2d at 496. Therefore, Stephens did not properly present his JNOV motion to the trial court, which leaves this issue unpreserved on appeal. *See* 372 S.C. at 20, 640 S.E.2d at 496–97 ("Because Craft did not renew his motion for a directed verdict at the close of all evidence, there is no JNOV motion to review."); *see also Hendrix v. E. Distribution, Inc.*, 316 S.C. 34, 37, 446 S.E.2d 440, 442 (Ct.App.1994) ("The rule that a judgment notwithstanding the verdict may not be granted unless the moving party moved for a directed verdict at the close of all the evidence is a strict one."), *vacated in part on other grounds*, 320 S.C. 218, 464 S.E.2d 112 (1995) (per curiam).

Stephens makes several arguments that the rule requiring the renewal of an unsuccessful directed verdict motion does not apply in the procedural circumstances presented in this case. He first argues the rule applies only to a directed verdict motion made by a defendant, as it would be "illogical" to require a plaintiff to renew his directed verdict motion after he presents reply evidence. We disagree. The facts and procedural circumstances of this case illustrate that the rule always applies when the question of law addressed in the motion is whether the facts yield only one reasonable inference. *See* Rule 50(a), SCRCP ("When upon a trial the case presents only questions of law the judge may direct a verdict."); *Hanahan v. Simpson*, 326 S.C. 140, 149, 485 S.E.2d 903, 908 (1997) (stating "when only one reasonable inference can be deduced from the evidence, the question becomes one of law").

Stephens' argument that he was entitled to partial directed verdict is based primarily on section 58–15–910 of the South Carolina Code (1976), which requires that a train engine's

horn be sounded "at the distance of at least five hundred yards from the place where the railroad crosses any public highway, street or traveled place and be kept ... whistling until the engine ... has crossed such highway, street or traveled place." [3] When Stephens made the motion, he relied on evidence that the horn was sounded for a distance of less than 1,500 feet, including the data from the train's event recorder indicating that the horn began sounding 1,161 feet from the crossing. The event recorder is an electronic device that records data from various systems in the train. Stephens argued its record of when the horn was sounded should be considered conclusive and thus he was entitled to a directed verdict that CSX breached its duty of reasonable care. However, in CSX's case-in-chief, the train's engineer testified as follows:

Q: Did you believe that you blew the horn at the whistle post?

A: I believe I started at the whistle post.

The whistle post was 1,544 feet from the crossing. This testimony by the engineer appears to create a conflict in the evidence, and if so, the trial court could not have properly granted Stephens' motion at that time.

Stephens argues, however, that viewing even this testimony by the engineer in context, there is only one reasonable inference to be drawn from the evidence—that CSX failed to sound the whistle on time and thus violated section 58–15–910. We agree that, taking this statement by the engineer in the context of his entire testimony, the inference that he blew the horn on time is a weak one. In the next question to the engineer, CSX's counsel asked, "the event recorder says you were short, right?" The engineer answered, "right." Counsel also asked whether the engineer was "disputing what the event recorder said," and the engineer replied, "No, I'm not." On cross examination, Stephens' counsel asked the engineer if "we can agree that you failed to blow the horn of the locomotive for 1500 feet before the crossing as required by the

---

**3.** Alternatively, a "bell of at least thirty pounds' weight" may be rung for the same distance. *Id.* Nothing in the record indicates CSX met this alternative requirement.

company rule and South Carolina law?" The engineer replied, "According to the event recorder."

There is other testimony from the engineer, however, that supports the inference he blew the horn on time. Stephens' counsel read into the record notes a CSX official took from a statement the engineer gave him—"The engineer thought he started at whistle post." Stephens' next question to the engineer was "your best memory that day was that you started that blowing the horn at the whistle post?" The engineer stated, "Right." Stephens' counsel cross-examined the engineer using his deposition, in which the engineer testified "[I] believe [I] started blowing the horn at the whistle post." Explaining his deposition testimony, the engineer testified at trial, "I started at the whistle post, I thought, and I was in the process of blowing two longs, a short, and a long."

Even as to the engineer's testimony that he was not disputing what the event recorder said, there is reason to believe he did not intend to admit violating the statute. The engineer testified he did not know how to interpret the recorder's data, and he never stated whether he agreed or disagreed with what the data indicated. The engineer's statement "[a]ccording to the event recorder" could be interpreted either as a concession he did not blow the horn on time or simply as an acknowledgement of what the event recorder said, not a concession of its accuracy. When Stephens' counsel asked the engineer "you have testified previously you don't contest the event recorder," he replied "I did not." The answer can be interpreted as stating he *does* "contest" the accuracy of the recorder, or as denying he ever said that. While it is possible to draw from the engineer's testimony the inferences Stephens argues should be drawn, the testimony also supports an inference that the engineer was simply conceding the existence of the data, which he did not understand, but not agreeing to its accuracy.

The point of this discussion is not whether the trial court should have granted the motion for directed verdict, but whether the issue is preserved. During his presentation of evidence on reply, Stephens introduced a stipulation with CSX that the data from the train's event recorder was accurate.[4] If

---

4. The exact language of the stipulation is not known, as Stephens did not include it in the record on appeal.

conflicting inferences could be drawn from the engineer's testimony at the point when the motion was made, the stipulation arguably removed the conflict. Stephens makes this very argument in his reply brief:

> After the Appellant's directed verdict motion, and before the close of all evidence, the Appellant offered the stipulation of CSX as to the accuracy of the event recorder on the locomotive. The accuracy of the event recorder ... bolstered ... the evidence that CSX had not complied with [section] 58-15-910.

The argument proves our point on preservation. In response to Stephens' motion for partial directed verdict, CSX argued the engineer "believe[s] he did begin sounding at the whistle post.... That is an issue of fact." The trial court saw a conflict in the evidence and stated, "I am going to deny the directed verdict motions to CSX.... I think it is a jury issue." The stipulation was entered in evidence after this ruling. By not renewing his motion, Stephens never gave the trial court an opportunity to consider whether the stipulation eliminated the conflict the court saw in the evidence as to this issue. Even if we thought the trial court was mistaken as to the ruling it did make, we have no idea how the court would have ruled in light of the stipulation. This illustrates the reason for the rule—a party must renew his directed verdict motion at the close of all evidence so that the court may decide whether evidence presented after it denied the earlier motion changed the evidentiary landscape in such a way that directed verdict has now become appropriate.

For these reasons, we reject Stephens' argument that the rule requiring the renewal of an unsuccessful motion for directed verdict does not apply to the facts and procedural circumstances of this case. *See State v. Bailey*, 368 S.C. 39, 43 n. 4, 626 S.E.2d 898, 900 n. 4 (Ct.App.2006) (stating in a criminal case "[i]f a defendant presents evidence after the denial of his directed verdict motion at the close of the State's case, he must make another directed verdict motion at the close of all evidence in order to appeal the sufficiency of the evidence").

Stephens' second argument is that even without the stipulation, he was entitled to a directed verdict at the time he

made his motion because CSX's counsel admitted in his opening statement that the engineer did not begin sounding the horn at the whistle post. Even if Stephens is correct about the significance of what CSX's counsel said, Stephens' failure to renew his motion still leaves the issue unpreserved. Moreover, Stephens did not make this argument to the trial court. When Stephens made his motion for partial directed verdict, he never contended that counsel's remarks in opening statement constituted a binding admission that CSX breached its duty. *See Armstrong v. Collins*, 366 S.C. 204, 224–25, 621 S.E.2d 368, 378 (Ct.App.2005) (finding because appellant did not present to the trial court the argument he raised in his appellate brief, the trial court was never given an opportunity to rule upon that argument, and thus the argument was not preserved for appeal).

The trial court's denial of Stephens' motions for directed verdict and JNOV are not preserved.[5]

## V. Jury Charge Rulings

■ Stephens challenges a number of rulings the trial court made in regards to the jury charge. Our review of the trial court's jury charge is controlled in the first instance by the fact that the trial court prepared special interrogatories for the jury to answer in returning its verdict, and that the jury resolved the case by finding that neither CSX nor DOT breached its duty of reasonable care. Because the jury's verdict on that basis made it unnecessary for the jury to reach the other issues in the case, it is not necessary that we address any ruling on the jury charge unless it relates to breach of CSX's and DOT's duty of reasonable care. *See Cole v. Raut*, 378 S.C. 398, 405, 663 S.E.2d 30, 33 (2008) (stating an erroneous jury instruction "is not grounds for reversal unless the appellant can show prejudice from the erroneous instruction"); *Clark v. Cantrell*, 339 S.C. 369, 390, 529 S.E.2d 528, 539 (2000) ("[E]ven if the trial court erred in failing to give a requested instruction, the requesting party also must show

---

5. Stephens also appeals the trial court's refusal to grant him partial directed verdict that CSX breached its duty of reasonable care by not removing the trees at the crossing. For the reasons discussed above regarding preservation, and because the record is full of conflicting evidence on this issue, we affirm the trial court's decision.

that the error was prejudicial to warrant reversal on appeal."). Therefore, we address only those issues on appeal challenging portions of the charge given, or the refusal to give requested charges, that relate to CSX and DOT's alleged breach of their duty of reasonable care. Specifically, we find it unnecessary to address the issues raised by the dissent regarding the presumption against impairment and "Train Time" charges, as those alleged errors could hardly have affected the jury's deliberations over whether CSX or DOT breached its duty of reasonable care, and could not possibly have prejudiced Stephens.

### A. Rejection of Stephens' Proposed Charges on a Railroad Company's Duties

Stephens argues the trial court erred in rejecting two proposed instructions concerning a railroad company's liability for injuries occurring at crossings. In the first, Stephens requested the court charge the jury:

A railroad corporation has a duty to maintain its right-of-ways and highway railroad grade crossings in a reasonabl[y] safe condition. If a railroad corporation negligently allows vegetation to grow on its right-of-way adjacent to the crossing to such an extent that it obscures or obstructs the vision of the driver of a motor vehicle using the roadway, it is liable to anyone who is injured in a collision, if the obstructing vegetation contributed as a proximate cause to the collision.

In his second proposed instruction, Stephens requested the court charge: "When vegetation at a railroad crossing is such that it obstructs a motorist's view of an oncoming on train, the railroad has a duty to exercise added care in the operation . . . of its train as the train approaches and crosses the crossing."

We find the instructions the trial court gave adequately addressed the substance of both of Stephens' proposed instructions. "It is not error to refuse a request to charge when the substance of the request is included in the general instructions." *See Brown v. Stewart*, 348 S.C. 33, 53, 557 S.E.2d 676, 686 (Ct.App.2001). As to the first proposed instruction, the trial court's general instructions fully and accurately explained the concepts of negligence and proximate

cause. The court also specifically instructed the jury that "a railroad corporation has a duty to maintain a reasonably safe grade crossing." As to the second proposed instruction, the court instructed the jury that a railroad company must use "reasonable and ordinary caution to prevent accidents at [a] crossing, and this degree of care may be affected by obstructions which prevent the track from being seen as a train approaches." While this instruction does not specifically refer to "added care," it explains that obstructions affect what a railroad must do to comply with its duty of care. We do not believe the jury would have understood the charge to mean the presence of sight obstructions would allow CSX to exercise less care at the crossing. In any event, the precise manner in which an obstruction affects the degree of care required by a railroad or a driver is a matter for the parties to argue in closing argument, not one for the trial court to address in its charge. *See* S.C. Const. art. V, § 21 ("Judges shall not charge juries in respect to matters of fact, but shall declare the law."). The trial court committed no error in refusing to give the requested instructions.

 Stephens argues the trial court's alleged error in refusing these charges was compounded by the instruction it gave that a motorist whose vision is obscured "must exercise due care consistent with the increased danger occasioned by the conditions that obstruct their vision." He contends this instruction led the jury to believe the law places the duty of care entirely on the motorist, when the law actually places duties on both the railroad company and the motorist. Stephens is correct that there are mutual duties, and that the duties of each must be exercised in light of all surrounding circumstances. *See Chisolm v. Seaboard Air Line Ry.,* 121 S.C. 394, 401, 114 S.E. 500, 503 (1922) ("A railroad company and a traveler on a highway crossing are charged with a mutual duty of keeping a lookout for danger, and the degree of vigilance required of both is in proportion to the known risk; the greater the danger, the greater the care required of both."). The trial court conveyed that point to the jury, however, stating "there is a mutual duty on traveler and railroad to exercise due care." Additionally, the trial court instructed the jury that "both the traveler and the company are charged with the same degree of care: the one to avoid

being injured; and the other to avoid inflicting injury. The care of each must be commensurate with the risk and danger involved. The greater the risk, the greater the care." We find no error.

## B. Charging on Signage Rules and DOT's Authority to Close Railroad Crossings

 Stephens argues the trial court erred in charging the substance of three statutes pertaining to signs at railroad crossings: section 56-5-1010 (2006), which requires railroad companies to install and maintain cross-buck signs at crossings; section 58-17-1390 (1976), which requires railroad companies to install and maintain signs reading "Railroad Crossing" at crossings; and section 56-5-1020 (2006), which prohibits unauthorized signs, signals, or other devices at crossings. The court also instructed the jury on section 58-15-1625 (Supp.2011), which authorizes DOT to close railroad crossings to public traffic when DOT finds the increased public safety of closing the crossing outweighs the inconvenience caused to motorists who will have to take another route.

Despite Respondents' argument to the contrary, Stephens' challenges to these instructions are preserved. However, the charges contain accurate statements of law, and there was evidence to support the trial court's decision to give each of them. *See Clark*, 339 S.C. at 390, 529 S.E.2d at 539 (stating a trial court must charge the current and correct law of South Carolina, and must charge principles of law that apply to the issues raised in the pleadings and developed by the evidence in support of those issues).

As to the first two charges, Stephens claimed in his complaint that, in addition to failing to remove vegetation and properly sound the train horn, CSX was negligent "in maintaining an unreasonably hazardous and unsafe crossing" and "in failing to maintain adequate warning devices at the crossing." CSX's duty to install and maintain the cross-buck and railroad crossing sign relate to those claims.

 As to the third charge, Stephens' grade crossing safety expert gave an opinion that the Hill Road crossing could be made safer with the installation of active traffic-

control devices, such as lights and gates. DOT's traffic management engineer, Richard Jenkins, testified railroad companies have installed gates and lights at crossings without DOT's authorization. The charge on section 56–5–1020 was applicable because it informed the jury that CSX could not legally install active traffic-control devices without DOT's authorization.

Finally, as to DOT's authority to close crossings, the charge properly relates to the liability of DOT. Further, Jenkins testified railroads have closed crossings without asking DOT for permission. From that testimony, the jury could have inferred CSX should have closed the crossing. Section 58–15–1625 places the power to close crossings in DOT's hands. Accordingly, the charge on that statute was applicable because it showed the jury CSX did not have the authority to close Hill Road at the crossing.

We find the trial court did not err in giving these charges.

### C. Charging on Discretionary Act Immunity

Stephens argues the trial court erred in charging the jury on subsection 15–78–60(5) of the South Carolina Code (2005), which immunizes governmental entities from liability for injuries caused by "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." [6]

"To establish discretionary immunity, the governmental entity must prove that the governmental employees, faced with alternatives, actually weighed competing consider-

---

6. Discretionary act immunity is an affirmative defense, which the defendant bears the burden of proving. *Creech v. S.C. Wildlife & Marine Res. Dep't*, 328 S.C. 24, 28, 491 S.E.2d 571, 573 (1997). However, it is not clear whether discretionary act immunity comes into play only after a plaintiff establishes the elements of negligence, or instead relates to the question of whether a governmental entity breached its duty in the first place. *See Pike v. S.C. Dep't of Transp.*, 343 S.C. 224, 230, 540 S.E.2d 87, 90 (2000) (stating discretionary act immunity requires proof that the government entity used "accepted professional standards," "actually weighed competing considerations and made a conscious choice"). If the latter is true, then the court's instruction could have affected the jury's verdict that DOT did not breach its duty. Thus, we address this issue.

ations and made a conscious choice." *Pike*, 343 S.C. at 230, 540 S.E.2d at 90. "[T]he governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them." *Id.* (citation and quotation marks omitted). In this case, DOT asserted it was entitled to an instruction on discretionary immunity for its installation of the stop sign and the stop line at the crossing. Stephens contends DOT did not present evidence entitling it to the instruction.

We agree with Stephens that DOT did not present sufficient evidence to prove its discretionary act immunity claim. However, that does not necessarily mean the trial court erred in giving the instruction. The trial court was never asked to direct a verdict on DOT's immunity claim. At the charge conference, therefore, the court approached the issue believing immunity was for the jury to decide. The arguments on whether to instruct the jury on discretionary act immunity centered on whether there was evidence of DOT making an actual choice in where it located the stop sign or the stop line. With regard to the stop line, there was evidence that the DOT employee who installed it made a conscious choice between two potential locations.

On appeal, Stephens contends the immunity defense failed because DOT did not follow an accepted professional standard in its placement of the stop sign or the stop line. Stephens did not present this argument to the trial court. We will not reverse the trial court's jury charge based on a point Stephens never asked the court to consider. *See Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 23, 602 S.E.2d 772, 779–80 (2004) ("[A]rguments are preserved for appellate review only when they are raised to and ruled on by the lower court."). Therefore, we affirm.

## VI. Conclusion

For the foregoing reasons, the trial court's decisions are **AFFIRMED.**

HUFF, J., concurs.

SHORT, J., concurs in part and dissents in part.

SHORT, J.

I concur with the majority regarding the trial court's exclusion of subsequent remedial acts. I also concur with the majority's finding that Stephens failed to preserve the issues regarding the trial court's denial of her motions for directed verdict and JNOV. However, I respectfully disagree with the majority regarding the alleged erroneous jury charges, and I would reverse and remand for a new trial.

First, I agree with the majority that DOT failed to present sufficient evidence to entitle it to a jury charge on discretionary immunity. However, I disagree with the majority's conclusion that despite DOT's failure to prove entitlement to the charge, the trial court did not err by giving the charge. Furthermore, I find Stephens was prejudiced by the error because the charge could easily have confused the jury. Here, as noted by the majority, there was testimony by three DOT employees about the conditions near the crossing.

I also note the trial judge erred in charging section 56–5–2930, which makes it unlawful for a person to drive a motor vehicle under the influence, but refusing to charge section 56–5–2950(G)(1), which provides that a person with a blood alcohol level of .05% or less is conclusively presumed to not be under the influence. See S.C.Code Ann. §§ 56–5–2930; –2950(G)(1) (Supp.2011). The trial court also charged that DOT was immune from liability for the criminal actions of third persons. S.C.Code Ann. § 15–78–60(20) (2005). Colvin admitted she consumed one or two wine coolers in the five hours preceding the accident and took prescription medications. Her blood alcohol content was measured at .018% following the accident. I conclude the trial court erred by charging the criminal driving under impairment statute and the immunity statute without charging 56–5–2950(G)(1), which permitted Colvin to rebut her alleged impairment and prejudiced her.

I next find the trial judge erred in charging CSX's proposed request to charge Number 45, which stated, "It is Always Train Time at the Crossing." In my view, this could have implied to the jury that CSX and DOT had lesser duties of care than a motorist and constituted prejudicial error.

Finally, I find these errors were not harmless beyond a reasonable doubt. *See Wells v. Halyard,* 341 S.C. 234, 237, 533 S.E.2d 341, 343 (Ct.App.2000) ("An alleged error is harmless if the appellate court determines *beyond a reasonable doubt* that the alleged error did not contribute to the verdict.") (emphasis added). Accordingly, I would reverse and remand.